603 A.2d 668

**Allen SEGAL, Jane Segal, and Gary Segal, trading as 1401 Ivy Hill Associates, Petitioners,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 1991.

Decided Feb. 3, 1992.

Reargument Denied April 2, 1992.

Petition for Allowance of Appeal Denied Sept. 28, 1992.

Thomas H. Brock, for petitioners.

Catherine Stewart, Asst. counsel, for respondent.

Before COLINS and PELLEGRINI, JJ., and LORD, Senior Judge.

PELLEGRINI, Judge.

Allen Segal, Jane Segal and Gary Segal, trading as 1401 Ivy Hill Associates (Ivy Hill), appeal from a final order of the Director, Office of Hearings and Appeals (Director) of the Department of Public Welfare (Department) which adopted an Attorney Examiner's determination and recommendation denying Ivy Hill's appeal from audit adjustments

of Medical Assistance Program (Medicaid) reimbursement allowances.

On May 15, 1984 Ivy Hill purchased the Green Acres Nursing and Rehabilitation Center (nursing facility) as an ongoing operation for $3,438,159, for which Ivy Hill borrowed approximately $3,500,000 (loan) to finance the purchase. During the course of the purchase, Ivy Hill also incurred settlement or "soft" costs such as legal, accounting and commitment fees (soft costs) in the amount of $68,338.

In order to obtain Medicaid reimbursement[1] for the soft costs and interest on the loan, Ivy Hill submitted cost reports for the fiscal periods ending December 31, 1984, December 31, 1985, June 30, 1986 and June 30, 1987. During an audit for the relevant fiscal periods, the Department's auditors disallowed Medicaid reimbursement for the amortization of soft costs in the amount of $18,159.00, reclassified $63,338.00 of the soft costs on the ground that these costs were not capital costs but net operating costs,[2] and disallowed reimbursement of the portion of the interest deemed by the Department to be excessive.

Ivy Hill took exception to these disallowances and to the method used by the Department to calculate excess interest. On November 28, 1989 a formal hearing on the matter was held before an Attorney Examiner and on August 10, 1990 the Attorney Examiner filed an Adjudication and Recommendation concluding that Ivy Hill's appeal should be denied because Ivy Hill's soft costs were properly treated as net operating costs and because the Department's method for computing and adjusting Ivy Hill's interest payments was in accordance with legal authority. On September 13, 1990 the Director issued a final order adopting the Attorney

1. The prior owner of the facility had participated as a provider in the Medicaid program and had received reimbursement for depreciation of the assets which were subsequently sold to Ivy Hill.

2. Because the soft costs were reclassified as net operating costs, they became subject to the ceiling imposed on total operating costs. *See* 55 Pa.Code § 1181.216.

Examiner's recommendation in its entirety. Ivy Hill's appeal to this Court followed.[3]

■ Initially, we note that in *Department of Public Welfare v. Forbes Health System*, 492 Pa. 77, 422 A.2d 480 (1980), our Supreme Court set forth two principles with respect to review of an agency's interpretation of its own regulations. First, the agency's interpretation may not be disturbed unless it is plainly erroneous or inconsistent with the regulation interpreted. Second, the interpretation must be consistent with the underlying policies or objectives of the underlying statute.

■ Ivy Hill contends that the Department erroneously classified the soft costs as net operating costs. Because those costs were incurred during the purchase of the nursing facility, Ivy Hill argues, they should have been added to the asset basis and depreciated over the useful life of the nursing facility.

Whether or not a cost item is a capital expense is determined pursuant to both the federal Medicare Provider Reimbursement Manual, Health Insurance Manual–15 (HIM–15), 1 Medicare and Medicaid Guide (CCH), par. 4590—5999z-57[4] and the Department's Manual for Allowable Costs (Manual), *printed in* 8 Pa.B. 2826–2838 (1978).[5] While the Manual is silent regarding soft costs, it does provide that capital expenses, defined as allowable depreciation or inter-

---

**3.** Our scope of review is limited to a determination of whether the Department's adjudication is in accordance with law, whether any constitutional rights were violated or whether the findings of fact upon which the adjudication was based were supported by substantial evidence. *Episcopal Hospital v. Department of Public Welfare*, 107 Pa.Commonwealth Ct. 272, 528 A.2d 676 (1987).

**4.** Pennsylvania's Medical Assistance Program, Sections 441.1–453 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *added by* Section 5 of the Act of July 31, 1968, P.L. 904, *as amended*, 62 P.S. §§ 441.1–453, is coordinated with and partially funded by the federal medical assistance program under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396p.

**5.** Allowable operating costs are determined subject to both the Manual and HIM–15, except that if the Manual and HIM–15 differ, the Manual takes precedence. 55 Pa.Code § 1181.65(d).

est on capital indebtedness, are, within certain limitations, recognized as allowable cost items. 55 Pa.Code § 1181.216.

The Department's auditor testified that in the case of a *newly constructed* facility, the soft costs of acquisition are incorporated into the asset basis and considered part of the historical cost of the asset for purposes of depreciation. In the case of an acquisition of an *on-going* operation, however, the soft costs of acquisition are considered an additional expense because the soft costs of the original acquisition of the facility have already been incorporated into the asset's basis and are being depreciated accordingly. Because the Department cannot reimburse the same cost twice, especially where, as here, the asset basis has been stepped up due to the fact that the sale took place prior to the enactment of the Deficit Reduction Act of 1984, P.L. 98–369, 98 Stat. 1079–1080, the Department's policy has been to treat the soft costs as an operating expense. The soft costs of acquiring an on-going facility are therefore reimbursed to the provider through amortization over a period of sixty months.

The Department's interpretation of "capital expense" comports with Section 204 of HIM–15 which provides, in pertinent part:

> In addition to interest expense, other expenses are incurred in connection with mortgage transactions. They may include attorney's fees, recording costs, transfer taxes and service charges which include finder's fees and placement fees. These costs to the extent they are reasonable, should be *amortized* over the life of the mortgage in the same manner as bond expense. (Emphasis added).

In the present appeal, because Ivy Hill did not construct the nursing facility but financed the purchase of the facility through a loan—in effect, a mortgage transaction—the costs associated with the purchase should have been amortized over the life of the loan. The soft costs should not be treated as a capital expense which can be depreciated.

Furthermore, under the Department's cost report (Form MA-11), the auditors are required to audit provider costs based on the instructions to Form MA-11, 55 Pa.Code § 1181.74(a)(4), which specify that "deferred charges" such as items constituting soft costs be reported as an amortization expense and not as a capital expense. Because the Department's interpretation of the regulations is consistent with Section 204 of HIM-15, Ivy Hill cannot be reimbursed for those costs on the ground that they constitute allowable depreciation.

As to whether soft costs can be treated as interest on capital indebtedness,[6] this Court has previously addressed that question in *Homestead Nursing and Convalescent Home v. Department of Public Welfare*, 135 Pa.Commonwealth Ct. 47, 579 A.2d 440 (1990). In *Homestead*, the provider sought to have the soft costs associated with its purchase of an on-going operation classified as a component of interest on capital indebtedness. The Department, however, interpreted the definition of "interest on capital indebtedness" as an imposition of a limit on reimbursement to actual interest rates alone and, accordingly, characterized the provider's soft costs as a net operating expense. Finding that this interpretation was not plainly erroneous or in violation of the regulation, this Court refused to reclassify the provider's soft costs as interest on capital indebtedness.

Ivy Hill's soft costs are neither allowable depreciation nor interest on capital indebtedness, and those costs should not be treated as a capital expense. Instead, those costs should be treated as an amortization expense. We find the Department's interpretation of its own regulations to be reason-

---

6. Section 202.1 of HIM-15 provides the following definition:
   Interest is the cost incurred for the use of borrowed funds, generally paid at fixed intervals by the user....*Interest on capital indebtedness is the cost incurred for funds borrowed for capital purposes, such as the acquisition of facilities, equipment, and capital improvements.* Generally, loans for capital purposes are long-term loans. (Emphasis added).
   Furthermore, the Department's regulations define the term as "[t]he direct cost incurred for funds borrowed for capital purposes." 55 Pa.Code § 1181.202.

able and not plainly inconsistent with the regulations, *Fair Winds Manor v. Department of Public Welfare*, 517 Pa. 106, 535 A.2d 42 (1987), and we find no error in the Department's treatment of Ivy Hill's soft costs.

■ Ivy Hill also contends that the Department improperly computed excess interest payments. Necessary and proper interest on capital and current indebtedness is an allowable cost for Medicaid reimbursement. 55 Pa.Code § 1181.260. The Department may, however, disallow reimbursement for excess interest where the nursing facility's purchase price exceeded the cost basis adjusted for depreciation taken by the prior owner. *Grand Oak Nursing Home, Inc. v. Department of Public Welfare*, 116 Pa.Commonwealth Ct. 453, 541 A.2d 800 (1986), *aff'd*, 518 Pa. 54, 540 A.2d 265 (1988). The Department's regulations provide, in pertinent part:

> (g) Necessary interest on capital indebtedness applying to mortgages, bonds, notes or other securities on the property and plant of the facility will be recognized subject to the limitation of the amount recognized for depreciation purposes. The total value of mortgages, bonds, notes or other securities on which interest on capital indebtedness is allowed may not exceed the depreciation basis of the assets at § 1181.259(m), (n) and (*o*) (relating to depreciation allowance).

55 Pa.Code § 1181.260(g). Moreover, Section 203 of HIM-15 provides:

> INTEREST ON LOANS IN EXCESS OF ASSET VALUE, ACQUISITION AFTER JULY 1970.
>
> A. Where a loan is obtained to finance the purchase of a facility or a tangible asset ... that is acquired after July 1970, and the purchase price exceeds the historical cost ... or the cost basis ..., interest expense on that portion of the loan used to finance the excess is not considered reasonably related to patient care and is not allowable.

█  The parties, while in agreement that excess interest may be disallowed and need not be reimbursed, *Grand Oak Nursing Home v. Department of Public Welfare*, 116 Pa.Commonwealth Ct. 453, 541 A.2d 800 (1986), *aff'd*, 518 Pa. 54, 540 A.2d 265 (1988), disagree on the methodology to be used to compute excess interest. Ivy Hill contends that the Department's methodology is erroneous in that the Department calculated the excess percentage only once, that is, at the time the asset was acquired, and then consistently applied that same percentage each year over the life of the loan regardless of the decreasing balance of the loan. To calculate the amount of excess interest, the Department subtracted $3,014,136 (the depreciable basis of the facility) from $3,374,403 (the principal of the loan) to obtain $360,269 (the amount in excess of the asset basis). The Department next compared the excess amount to the loan amount and determined that there was excess borrowing of 10.68%. The Department, rationalizing that 10.68% of the interest paid on each dollar borrowed is excess until the total loan is repaid, then reduced the interest expense by 10.68% each year.

Ivy Hill contends that the Department should have computed excess interest based on Schedule F–1 of the cost report,[7] as follows:

1. The provider calculates its total average debt for the fiscal year by adding its indebtedness at the beginning of the fiscal year and its indebtedness at the end of the fiscal year and then dividing by two.

2. The provider next calculates the excess debt for the year by subtracting the depreciable basis from the average debt determined in Step 1.

3. The provider then determines the excess debt as a percentage of total debt by dividing the excess debt calculated in Step 2 by the average total debt calculated in Step 1.

---

7. The purpose of Schedule F–1 is to compute the excess interest and depreciation over and above the $22,000 per bed limitation. *See* 55 Pa.Code §§ 1181.259(s), 1181.260(k).

4. Finally, the provider must disallow that portion of its interest expense equal to the percentage of the total average debt deemed excessive by multiplying the provider's interest expense for the year by the percentage calculated in Step 3.

According to Ivy Hill's method, the portion of the provider's debt that is deemed excessive would progressively decrease as debt is retired:

May 15, 1984 through December 31, 1984 9.71%

January 1, 1985 through December 31, 1985 7.08%

January 1, 1986 through June 30, 1986 4.51%

July 1, 1986 through June 30, 1987 1.71%

While Ivy Hill offers an alternative interpretation of the regulations, the Department has interpreted the regulations as providing for a one-time calculation of the percentage of interest that is excessive, to be computed at the time the facility was acquired, which is applied uniformly throughout the life of the loan. Because the Department's methodology for calculating excess interest is not plainly inconsistent with the regulations, *Fair Winds, supra,* and because deference must be given to the Department's interpretation of its own regulations, we will affirm the order of the Department.

## ORDER

AND NOW, this 3rd day of February, 1992, the order of the Commonwealth of Pennsylvania, Department of Public Welfare, dated September 13, 1990, is hereby affirmed.